| | | |
|---|---|---|
| JINGQIU MAO LERCH, | ) | |
| | ) | |
| Plaintiff, | ) | No. 15 C 08646 |
| | ) | |
| v. | ) | |
| | ) | Judge Edmond E. Chang |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

In April 2011, the United States filed a judgment lien against the property at 294 Maplewood Road, Riverside, Illinois (call it the "Riverside property"). Exh. 42, Abstract of Judgment. The title owner of the property is Jingqiu Lerch (Jingqiu). The lien was a result of a judgment against William Lerch (William), Jingqiu's husband, who has since passed away. In 2015, Jingqiu brought a quiet-title action against the federal government in state court, seeking to vacate the lien against her property. R. 1, Not. of Removal at 1.[1] That action was removed to federal court and became this lawsuit.[2] *See id*. The government then filed a counterclaim seeking to foreclose on its lien against the Riverside property, arguing that Jingqiu held the property as

---

[1]Citations to the record are noted as "R." followed by the docket number and the page or paragraph number. The exhibits introduced during the bench trial are not on the docket, but the parties' preliminary exhibit list is. R. 77, Proposed Exh. List. Note that the parties added two additional exhibits at trial: Exh. 60, Closing Docs. (including the bill of sale); Exh. 61, Jingqiu's Bank Statements.

[2]The Court has subject matter jurisdiction over these claims under 28 U.S.C. § 1444.

William's nominee, that William was the true owner of the entire property, and that the government's lien was thus valid.[3] R. 26, Answer and Counterclaim at 4-10.

After the case was reassigned to this Court's calendar, the Court held a bench trial on December 13, 2018. At the trial, the witnesses were Alex Pulles, a financial investigator for the government, and Jingqiu Lerch. Deposition testimony from William Lerch was also entered into evidence.

After considering all the evidence presented, the Court finds that the government has not proven that Jingqiu owned the entire property as William's nominee. What the government *has* proved is that Jingqiu and William purchased the house together and held the property as tenants in common. This means that the government may foreclose on a 50% interest in the property, and Jingqiu retains ownership of the other 50%.

## I. Background

To understand the government's asserted judgment lien requires going back to the mid-1990s. In 1995, a company called National Lacquer purchased a site at 7411-7431 South Green Street in Chicago. *United States v. Capital Tax Corp.*, 545 F.3d 525, 528 (7th Cir. 2008) (for convenience's sake, *Capital Tax Corp. I*). At the time, William was managing National Lacquer's operations at the site, and over the next several years, William also became National Lacquer's treasurer, and then a 50% owner (he co-owned the company with another man, named Steven Pedi). *United*

---

[3]Lerch filed a motion for summary judgment on her quiet-title claim on August 10, 2017. R. 44, Pl. Br. Summary Judgment. The Court denied that motion, reasoning that there were substantial factual disputes about whether Jingqiu was holding the property as a nominee for William. R. 59, Order on Mot. Summary Judgment.

*States v. Capital Tax Corp.*, 2007 WL 54039, at \*2-3 (N.D. Ill. Jan. 4, 2007) (call this second opinion *Capital Tax Corp. II*). National Lacquer "reclaimed paint, manufactured paints and coatings, and performed furniture stripping operations at the site." *Capital Tax Corp. I*, 545 F.3d at 528. In January of 1998, the Chicago Department of Environment inspected the site and found hazardous waste. *Capital Tax Corp. II*, 2007 WL 54039, at \*3. In May 1998, the Environment Department inspected the site again, this time with the Chicago Fire Department, and found more problems, including leakage from old, "rusty, damaged" paint containers from the site. *Id*. In July of the same year, National Lacquer entered into a settlement agreement with Chicago, agreeing to repair or dispose of leaking containers. *Id*. In October 2001, a different company, Capital Tax, obtained a tax deed for portions of National Lacquer's site, and sometime in 2002 it evicted William and National Lacquer from those portions of the site. *Id*. at \*4. But the hazardous waste had not been entirely cleaned up—or the issue arose again—because in April 2002 William put in an emergency call to the Department of Environment, alleging that Capital Tax was moving containers from its portions of the site onto his. *Id*. at \*5. Over a year later, in July and August 2003, the United States Environmental Protection Agency (EPA) got involved and inspected the site at least twice. *Id*. at \*6-7. It issued Unilateral Administrative Orders to Capital Tax, Pedi, and William in August, demanding that they clean up the site. *Id*. at \*7. In October 2003, the EPA began its own clean-up of the site. *Id*.

After the EPA cleaned up the site, it attempted to recover its costs from Capital Tax, Pedi, and William. *Capital Tax Corp. I*, 545 F.3d at 529; *see also Capital Tax Corp.*, 2007 WL 2225900, at *6-7 (N.D. Ill. Aug. 1, 2007) (*Capital Tax Corp. III*). Pedi settled with the EPA, *Capital Tax Corp. III*, 2007 WL 2225900at *13, but the EPA obtained judgments against Capital Tax and William. *See generally, id*. Jingqiu Lerch did not know about the judgments—or the EPA investigation at all—until September 2010. R. 59, Order on Mot. Summary Judgment at 5.

In the meantime, Jingqiu and William began a relationship. In 1997, the two got married. On October 31, 1999, they both signed a sales contract to purchase the Riverside property, Exh. 4, Sales Contract at 1,[4] and on December 30, 1999, William signed a home insurance application for the property, Exh. 7, Ins. App. at 2. But when the closing took place on January 4, 2000, Jingqiu's name was the only name on the warranty deed that was transferred to her by the sellers that day. Exh. 23, Closing Docs. at 2-4.

In March 2001, Jingqiu refinanced the original mortgage that was used to purchase the Riverside property. Exh. 8, Mortgage Note at 1; Exh. 2, Original Mortgage Release at 1. As of March 2001, the balance on the refinanced mortgage was $172,000. The debt was apparently paid off soon after, and on September 25, 2002, Jingqiu's mortgagee recorded a satisfaction of it. *See* Exh. 9, Mortgage Release at 1. Before the refinanced mortgage was paid off, William sold another property that

---

[4]Jingqiu testified that this exhibit is only a *draft* of the sales contract and argued that it is inadmissible as a result. But the draft is not offered as evidence of a legally binding sales contract, but it is relevant simply as one piece of evidence about the Lerches' intent as to ownership when they were planning on buying the Riverside property.

he owned, this one located in Cicero, Illinois, and he personally received $118,000 from that transaction. Exh. 18, William Lerch Dep. at 269:20-270:5.

Jingqiu and William separated in June 2001. Exh. 31, Diss. of Marriage at 1. Jingqiu took a three-month trip to China, and when she returned, she did not move back into the Riverside property. In November 2002, the divorce court issued a divorce judgment requiring William to quitclaim any interest in the Riverside property to Jingqiu, which he did. Exh. 31, Diss. of Marriage at 2. That quitclaim deed was filed on December 5, 2002. Exh. 32, Quitclaim Deed. On the same day, Jingqiu also filed a will, leaving the Riverside property to William in the event of her death. Exh. 3, Will.[5] The documents were filed just minutes apart. *Compare* Exh. 3, Will (stamped at 13:55:34), *with* Exh. 32, Quitclaim Deed (stamped at 13:47:45).

After Jingqiu and William's 2001 separation, William was the primary resident of the Riverside property. At some point after returning from her trip to China, Jingqiu rented an apartment in Schaumburg, Illinois; she was living there at the time of the divorce. Jingqiu visited the Riverside property in the years after that—although the parties dispute how often, and for what length of time—but she did not move back to live in the property permanently until September 2010. Instead, for the most part, Jingqiu lived in New York City from 2005 through 2010. During that time, she did not have a stable residence but instead stayed with friends or in short-term

---

[5]Jingqiu argues that the will was legally ineffective because it was not signed by two witnesses. R. 83, Lerch Mot. in Limine at 7. But the legal effectiveness (or not) of the will is not the purpose of the evidence; instead, the will is evidence of Jingqiu's intentions at the time it was recorded. *See* R. 88, Order on Mots. in Limine at 2.

rental situations and moved from one apartment to another—sometimes as frequently as from one night to the next—often because she could not afford rent.

After they divorced, Jingqiu and William had signed a lease of the Riverside property, in which William agreed to pay monthly rent of $2,950. Exh. 33, Rent Agmt. at 1. William stopped paying rent sometime in 2003 or 2004, after he was diagnosed with cancer. At that point, he and Jingqiu decided that in lieu of rent, he would pay the property taxes and cover all the utilities. But William stopped paying the property taxes in 2013, and it appears that Jingqiu never enforced the rental agreement in any way after that point.

## II. Legal Standard

A nominee is someone who holds legal title for the benefit of another person. Because the nominee does not hold a valid ownership interest in the property, a creditor of the property's *true* owner can recover against it—even though the true owner is not the legal title holder. Because "Illinois courts have never articulated a detailed standard for what constitutes a nominee," federal courts apply federal law in the analysis. *United States v. Szaflarski*, 614 Fed. App'x. 836, 838 (7th Cir. 2015) (non-precedential disposition). Typically, courts "consider several factors in determining whether a titleholder is actually serving as a nominee for the benefit of another." *Id*. The factors include:

> (1) whether there is a close personal relationship between the nominee and the transferor; (2) the nominee paid little or no consideration for the property; (3) the parties placed the property in the name of the nominee in anticipation of collection activity; (4) the parties did not record the conveyance; and, (5) the transferor continues to exercise dominion and control over the property.

*Id.* at 838-839; *see also Stone v. United States*, 2014 WL 1289788, at *10-11 (N.D. Ill. March 31, 2014) (applying the same five factors).

Typically, courts in the Seventh Circuit find that a party is holding property as a nominee when there has been some sort of fraudulent conveyance designed to hide the property from creditors. *See United States v. Swan*, 467 F.3d 655, 658 (7th Cir. 2006) ("Suppose a person who wants to evade taxes parks his property with a friend or family member. That would be a fraudulent conveyance, and so the person to whom the property was conveyed would be deemed the taxpayer's 'nominee' and forced to cough it up.").[6] As explained next, that is not what happened in this case.

---

[6]Other circuits do not require a fraudulent conveyance to find the legal titleholder a nominee, but instead focus their inquiry on which party is the true beneficial owner of the property. *See Scoville v. United States*, 250 F.3d 1198, 1202 (8th Cir. 2001) ("Regardless of whether the relationship between May, Scoville and the property at issue was actually fraudulent, the evidence amply demonstrates May's retention of a beneficial interest in the farm and the insurance policy sufficient to carry the government's burden."); *Oxford Capital Corp. v. United States*, 211 F.3d 280, 284 (5th Cir. 2000) ("A nominee theory involves the determination of the true beneficial ownership of the property.").

Although the Seventh Circuit has not held that a fraudulent conveyance is *required* to find that a legal titleholder is a nominee, the cases in which it has applied the nominee analysis involve an intent by at least some party to hide the assets involved. *See, e.g.*, *Szaflarski*, 614 Fed. App'x. at 839-40 (finding that the title holder was a nominee because her brother transferred the property to her after "discovering that he was subject to investigation" and in order to "thwart[] a forfeiture action against him."). In addition, the factors usually considered—as set out in *Szaflarski* and *Stone* (described above)—assume a transfer *from* the true owner to the title holder, and look specifically for a transfer "*in anticipation of* collection activity." *Id.* at 839. It is difficult to apply those factors here, in large part because William never had legal title in the property to transfer to Jingqiu in the first place. So the Court must look broadly to evidence of Jingqiu and William's intent at the time they purchased the property to determine whether they put it in Jingqiu's name to avoid collection activity.

### III. Analysis

### A. Jingqiu was not William's nominee.

The government has not proven that Jingqiu held title in the entire property merely as William's nominee. It has not provided convincing evidence that Jingqiu and William put the house in her name to hide it from his potential creditors, and it is unlikely William would have had any motive to do so at the time they purchased the home. What is actually likely—and what the government proved—is that Jingqiu and William purchased the house *together*, to live in it and to own it together.

### 1. There was no fraudulent conveyance from William to Jingqiu.

There are four main reasons why there is insufficient evidence of a fraudulent conveyance in this case. The first has to do with the timing of the purchase of the Riverside property. As explained earlier, Jingqiu got legal title to the property on January 4, 2000. *See* Exh. 23, Closing Docs. at 2-4. She and William had clearly planned to purchase the property since at least October 31, 1999, because that is when the sales contract (which Jingqiu testified at trial was just a draft) was first signed. Exh. 4, Sales Contract at 1. But there is no persuasive evidence that William would have anticipated a judgment against him at that time. He and National Lacquer had already entered a settlement agreement with the Chicago Department of Environment over a year before, in July 1998. *Capital Tax Corp. II*, 2007 WL 54039, at *3. And after that, there is no evidence in the record that Chicago or the EPA were investigating the property again until 2002. *Id.* at *5. So there is no reason to believe in the time frame when the Lerches were planning to purchase the property (that is,

between October 1999 and January 2000) that William was anticipating any judgment against him.

Second, there is another natural explanation for why William's name was not on the title to the property. William had filed for bankruptcy only three years earlier, which almost surely damaged his credit. *See* Exh. 16, Bankr. Stmt. Fin. Affairs at 11 (signed by William on April 22, 1996); *see also* Trial Testimony (Pulles testified that William's bankruptcy began in 1996). As a result, it would have been difficult for him to get a mortgage on the Riverside property, either under his name alone or co-signed with Jingqiu. It is reasonable to infer that someone who had recently gone through bankruptcy would not be on the mortgage for a new home, and that as a result they would not be on the title either.[7]

Third, Jingqiu credibly testified that she put in around $50,000 of her own funds toward the down payment on the property, and she presented documentary evidence to back up that claim. Specifically, the closing documents include images of five checks, which Jingqiu testified she and William used to pay the down payment for the property. Exh. 23, Closing Docs. at 12-13. The first three checks are made out to William G. Lerch, in the amounts of $4,700, $50,000, and $2,500. *Id.* at 12. The fourth check is made out to Jingqiu Lerch, in the amount of $36,230. *Id.* at 13. And

---

[7]Although it is not necessary to support this finding, the Court notes that William testified to exactly this explanation in his deposition. Exh. 17, William Lerch Dep. at 81:24-82:6 ("I had just gone through a bankruptcy and I was not creditworthy. I could not obtain a mortgage."); *see also* Exh. 18, William Lerch Dep. at 233:20-25. While Jingqiu did not designate lines 1-6 of page 82 of the deposition, Exh. 17, she did designate William's answers at 82:9, 13-14. Given her *pro se* status, the Court also incorporates the questions before those answers, beginning at 82:7, which illustrate that William was equating the title and the mortgage in this way.

the fifth check is also made out to Jingqiu Lerch, for $11,570. *Id*. The memo line has a note that reads, "Final Payment T/L 1997 Honda Civic." *Id*. Jingqiu testified that both the fourth and fifth checks represented *her* own funds—the contribution she personally made to the transaction. In response, the government argued that neither of these checks really represented Jingqiu's own money.

On the fourth check (which was in the amount of $36,230), Jingqiu testified that it came from her savings and was drawn from an account she held with Salomon Smith Barney. The government argued that the money might not have been hers in the first place and pointed to bank statements showing that almost $50,000 had been recently deposited via four different checks into Jingqiu's Salomon Smith Barney bank account in November 1999—shortly before the closing date, but *after* Jingqiu had already signed the sales contract in October 1999; there was trial testimony by Jingqiu acknowledging the timing.[8] *See* Exh. 61, Bank Statements at 10. Jingqiu could not remember, and did not have records to show, where those deposits came from, but testified at trial that she would have transferred them to her account from overseas bank accounts she had at the time. The government did not track down the sources of the funds or otherwise offer other evidence that the funds came from someone other than Jingqiu herself. Jingqiu credibly testified that she no longer had statements from her overseas bank accounts—or any other evidence about the

---

[8]The government used Jingqiu's January 2000 account statement to point out a withdrawal of $36,230 for a January 4, 2000 check to Harris Bank. Exh. 61, Bank Statements at 19. Jingqiu acknowledged that was the fourth check identified in the closing documents. The government then pointed to deposits into the account on November 12 ($932.49), November 17 ($8,516.33), November 18 ($5,000), and November 19, 1999 ($35,000)—all before she made the down payment withdrawal. *Id*. at 10.

November 1999 deposits. That is believable and understandable: there is no reason Jingqiu should have known in 2000 that she would be expected to show where the funds for her down payment had come from over a decade later (the lien was filed in 2011), much less at a trial in 2018. Ultimately, the Court credits her live testimony that she supplied the funds for the $36,230 check.

On the fifth check, which was for $11,570, Jingqiu testified that it was the insurance payout from a car accident that totaled her 1997 Honda Civic. The government solicited testimony from Jingqiu that the Honda Civic might actually have been purchased for her by one of William's companies. But the fact that the check was made out to *Jingqiu* alone supports the inference that she and William viewed the car as hers. She credibly testified that the insurance payment were her own funds. So the Court credits too that the $11,570 represented another set of funds that Jinqiu put into the property. With those significant contributions to the down payment, it is not likely that Jingqiu took title to the property to hide it from William's creditors. She had her own interest in the property—not just bare legal title as a nominee.

Finally, if Jingqiu and William put the house in Jingqiu's name in an attempt to hide it from William's creditors, they would likely have done a better job of covering up William's involvement. For example, they would not have had William sign the sales contract—even a draft version—from the beginning. And if William transferred money into Jingqiu's accounts to allow her to contribute to the down payment, he could have transferred the entire down payment amount to her (eliminating the need

for any funds directly from him at all). In short, they would have kept William from participating in the transaction in any way. If putting Jingqiu's name alone on the title was a cover-up, then it was a bad one. So bad that it is not likely what happened.

To be sure, it does seem unusual that William's name was not on the deed to the property, given that he contributed a significant amount to its purchase after signing the sales contract (whether a draft or not) around three months earlier. But those factors do not establish that William was the *sole* owner of the property, or that he and Jingqiu hid his interest in it from the government. Instead, they suggest that William and Jingqiu *co-owned* the property: they both contributed significantly to the down payment. Given that for all practical purposes they treated the Riverside property as a shared property, the explanation that William was not on the title simply because he was not creditworthy at the time makes sense. The most likely explanation is that Jingqiu and William planned to buy a house in both their names (they both signed a sales contract in October 1999), and then realized that it would be more practical to put the house in only Jingqiu's name. And as explained later in this opinion, Illinois law treats this circumstance as co-ownership, even though William's name was not formally on the deed.

## 2. Jingqiu and William's post-purchase behavior is evidence that they co-owned the Riverside property.

At trial, in an effort to show that William was the true, 100% owner of the property, the government pointed to evidence of William and Jingqiu's behavior after the purchase. But none of the post-purchase evidence undermines the probability that William and Jingqiu *co*-owned the property at the time they purchased it. Yes,

the post-purchase evidence suggests that the home was not Jingqiu's alone. But none of it suggests that the home was solely William's either.

First is the will that Jingqiu executed; it purported to leave the Riverside property to William in the event of her death. In the wake of the Lerches' divorce, on December 5, 2002, William quitclaimed his interest in the Riverside property to Jingqiu. Exh. 32, Quitclaim Deed. Just eight minutes after that quitclaim deed was recorded with the Cook County Recorder of Deeds, Jingqiu recorded a will (in the same Recorder's office) that granted the Riverside property back to William in the event of her death. *Compare* Exh. 3, Will (stamped at 13:55:34), *with* Exh. 32, Quitclaim Deed (stamped at 13:47:45). The timing of the recordation of Jingqiu's will is suspicious. Jingqiu testified at trial that she filed this will because she was concerned about something happening to her while she was traveling abroad (especially, according to her, in the wake of the September 11, 2001 terrorist attacks). Given that her parents lived in China and might have trouble sorting out her affairs in the United States, and given that William knew her parents and would be able to contact and help them, she wanted William to have control of her property if she passed. That is a plausible explanation in rebutting the argument that the quitclaim was a sham. But this evidence also bears on William and Jingqiu's intentions when they purchased the property: first, that William *did* have an ownership interest (though not a 100% interest) in the property, which prompted the divorce settlement to explicitly contain a provision requiring him to quitclaim the interest, *see* Exh. 31

Diss. of Marriage at 2; and second, that it would be sensible for William to receive the part ownership interest back, via the will, at the time of Jingqiu's death.

Moving on the next piece of post-purchase evidence, right before the Lerches' divorce, the entire remaining balance of Jingqiu's mortgage was paid off. As of March 21, 2001, Jingqiu owed $172,000 on the mortgage. Exh. 8, Mortgage Note at 1 (the January 4, 2001 mortgage was refinanced on that date). On September 25, 2002, Jingqiu's mortgagee recorded a satisfaction of its debt. *See* Exh. 9, Mortgage Release at 1. That means someone came up with around $172,000 during 2001 and 2002 to pay off the mortgage. It is more likely than not that William provided at least the bulk of the necessary funds. Jingqiu has not been able to identify where the funds for the satisfaction came from and did not attempt to explain them at trial. It is one thing not to have records of down payment money, but it is quite another to be unable to explain (even verbally) where the $172,000 came from. On top of this, William acknowledged in his deposition that the $118,000 he received from the sale of his Cicero property might have been used "to pay off the [Riverside] mortgage." Exh. 18, William Lerch Dep. at 234:18-235:2.[9] So William had funds available to pay a substantial portion of the mortgage balance; there is no evidence to suggest Jingqiu had anything similar.

---

[9]During the deposition, William testified that he was unsure whether the funds from the Cicero property would have been used for the Riverside down payment or whether instead they were used for the satisfaction of the Riverside mortgage, though he said it was "certain" that they were used for at least one of those transactions. Exh. 18, William Lerch Dep. at 234:22.. But based on the timing, it is clear that it would have been the satisfaction of the mortgage. William received a check transferring the $118,00 from the sale of the Cicero property in August 2001—*after* the Riverside mortgage was refinanced, but before it was satisfied. *Id.* at 269:20-270:11.

William's decision to pay off most of the mortgage balance is suspicious because he chose to pay off the debt on a property that he was about give up his interest in. By the time that the mortgage's satisfaction was recorded in September 2002, Jingqiu and William had been separated for almost a year, and they were less than two months away from finalizing their divorce. To be sure, it could have been a generous gesture on William's part—he may have wanted to square away Jingqiu's financial affairs before their marriage ended for good. Or, more likely (especially considered together with the timing of the filings of the quitclaim deed and Jingqiu's will a few months later), it suggests that William anticipated keeping some beneficial interest in the property even after the divorce.

The third post-purchase evidence in dispute is that, after William and Jingqiu's separation, William lived in the property most of the time instead of Jingqiu. Also, even though Jingqiu did not have a stable residence in New York City, and William had stopped paying the rent early on, she never attempted to evict him— either to live in the Riverside property herself or to sell it for cash. The government argued that Jingqiu never evicted William because, for all practical purposes, the property was his, and she could not evict him. Jingqiu, on the other hand, testified that she was trying to help him out after he was diagnosed with cancer, and that she trusted him to pay the rent eventually. It is possible both explanations have some truth to them: William had a beneficial partial interest in the property, which he took advantage of after his divorce from Jingqiu, while Jingqiu reasonably expected some form of rent from him and considered herself able to move back in if she needed to.

Jingqiu may either have opted not to evict William because she felt bad for him, or she might have felt she could not do so because the property was his, too. Neither explanation undermines the probability that she also had an ownership interest in the property.

Lastly, after the purchase of the Riverside property, William paid the property taxes for it beginning in either 2003 or 2004. At trial, Jingqiu maintained that he did so instead of paying the rent that they had agreed to in 2003. William's payment of the property taxes weighs slightly toward the inference that he considered himself at least a part owner of the property, but it does not establish that he owned the home alone—especially not at the time the property was purchased. All in all, none of the post-purchase evidence undermines the probability that Jingqiu had some ownership interest in the property.

## B. William and Jingqiu held the Riverside property as tenants in common.

### 1. Illinois law recognizes a beneficial interest in property when the parties intend to create one.

As explained above, the government has not proven that Jingqiu and William put the Riverside property in Jingqiu's to hide it from William's creditors, so Jingqiu is not William's mere nominee. But the evidence described above points to Jingqiu and William co-owning the property—the couple did not treat the property as Jingqiu's alone. Under Illinois law, if Jingqiu and William intended for William to have a partial ownership interest in the property when it was purchased, then William held a beneficial interest in the property under the Illinois doctrine of resulting trusts:

> A resulting trust … is created by operation of law and has its roots in the presumed intention of the parties. A court of equity will raise a resulting trust where land is bought with the money of one person and title is taken in the name of another. … A resulting trust arises, if at all, at the instant legal title is taken and the title vests.

*Wright v. Wright*, 118 N.E.2d 280, 283 (Ill. 1954) (cleaned up).[10] Finding a resulting trust requires "clear, convincing and unmistakable" evidence. *Scanlon v. Scanlon*, 127 N.E.2d 435, 438 (Ill. 1955).

Historically, Illinois courts have applied a presumption that no resulting trust arises when a husband purchases property and title to the property is placed in the name of his wife—that sort of transaction is presumed to be a gift. *Scanlon*, 127 N.E.2d at 438-39; *see e.g.*, *Baker v. Baker*, 107 N.E.2d 711 (Ill. 1952). But that presumption can be overcome by evidence that the purchase was not intended as a gift at all, and that the husband remained in control of the property. *See In re Estate of Koch*, 697 N.E.2d 931, 933 (Ill. App. Ct. 1998) (setting out several factors weighing toward both spouses having a beneficial interest in the property: "(1) the property constituted all or substantially all of the husband's estate; (2) the husband made improvements to the property; (3) the husband paid the taxes and/or the mortgage debt on the property; (4) the husband occupied the property as his home or place of business; and (5) the husband exercised control over or managed the property."). In *Scanlon v. Scanlon*, the Illinois Supreme Court found a resulting trust where a husband and wife purchased property using both their funds, but where it was clear

---

[10]This opinion uses (cleaned up) to indicate that internal quotation marks, alterations, and citations have been omitted from quotations. *See* Jack Metzler, *Cleaning Up Quotations*, 18 Journal of Appellate Practice and Process 143 (2017).

that the decision to put title in the wife's name only was not meant as a gift. 127 N.E.2d 435 (Ill. 1955). More recently, in *In re Estate of Koch*, the Illinois Appellate Court found a resulting trust where the husband had paid for the lot, paid the taxes, "transacted all of the business" involving the lot, and "managed the property." 697 N.E. 2d at 933-34 (citing *Scanlon* approvingly).

Here the evidence shows that, at the time they purchased the Riverside property, William and Jingqiu intended that they would *both* have beneficial interests in it, and that the property was not a gift from William to Jingqiu. During his deposition, William himself testified that his contributions to the down payment were *not* a gift to Jingqiu: "I don't think I'd call it a gift. I think I would call it my share of a house that I am going to live in." Exh. 17, William Lerch Dep. at 82:21-83:1. So William clearly considered himself to own a share of the house and to have paid for it, which aligns with his holding a resulting trust in the property along with Jingqiu.

Several other pieces of evidence also show that the couple owned the home together, as a family home for the two of them, at least at the time they purchased it and continuing until the lien was filed. Indeed, this Opinion described the evidence of co-ownership in the explanation of why neither William nor Jingqiu was the sole owner. In summary, first there is no dispute that William paid a substantial part of the down payment on the Riverside property, and he likely paid most of the satisfaction of the mortgage. That suggests he had a beneficial interest in it. Second, the fact that *he* was the one to stay in the house after the divorce—even as Jingqiu

had no stable place to live in New York City—suggests that the couple did not see it as Jingqiu's house alone in the years before the divorce. Third, the fact that Jingqiu recorded her will at virtually the same time as the quitclaim deed suggests that the two always saw it as both their house. And finally, the fact that William paid the property taxes for almost a decade suggests that he maintained control of the property and an interest in it.

### 2. The default rule makes William and Jingqiu tenants in common.

The bottom line is this: although William and Jingqiu did not purchase the home in Jingqiu's name alone in order to hide it from William's potential creditors, it is likely that they bought it as a home for the two of them, and that they both intended to benefit from ownership of it. Under Illinois law, William thus held a resulting trust in *his* interest in the property. Because in Illinois co-ownership of property that is not expressly declared to be a joint tenancy (or a tenancy by the entireties) is a tenancy in common, Jingqiu and William were thus tenants in common. 765 ILCS 1005/1 ("No estate in joint tenancy in any lands … shall be held or claimed … unless the premises therein mentioned shall be expressly declared to pass not in tenancy in common but in joint tenancy; and every such estate other than to executors and trustees … shall be deemed to be in tenancy in common.").

Although neither party expressly argued at trial that Jingqiu and William co-owned the Riverside property—the government argued that William was its sole rightful owner, Jingqiu argued that she was—this result should not come as a surprise to them. The factual basis for the finding that William held a beneficial

interest in the property, and that it was held by him and Jingqiu together as a tenancy in common, completely overlaps with the factual inquiry that was required in the nominee analysis. And the government had already mentioned the possibility of a tenancy in common: in its summary judgment briefing, it argued that if Jingqiu held an interest in the property along with William, then the co-ownership would not be a joint tenancy, but instead would be a tenancy in common. R. 53, Def. Resp. Br. Summary Judgment at 5-6. It is not surprising that the parties took the position that was most advantageous to them—sole ownership—but the facts do not support either side. Instead, Jinqiu and William held the Riverside property as tenants in common.

## IV. Conclusion

For the reasons stated above, the Court finds that Jingqiu and William held the property as tenants in common. So the Court grants partial judgment for Lerch, and partial judgment for the government: in light of the government's lien on William's tenancy, the government can force a sale—but it can only recover half of the proceeds from that sale.[11] Jingqiu is entitled to the other half of the proceeds. The Court will stay the execution of this judgment for 90 days, exercising its discretion

---

[11]"When a husband and wife hold joint title to real estate, a strong presumption arises that each spouse has an undivided one-half interest, irrespective of the contributions made by each to the acquisition of the property." *In re Snyder*, 436 B.R. 81, 89 (Bankr. N.D. Ill. 2010) (citing *Capogreco v. Capogreco*, 378 N.E.2d 279 (Ill. App. 1978)).

under Federal Rule of Civil Procedure 62(a) to give the parties time to work out an agreed sale or another arrangement. A status hearing is set for February 26, 2019 at 10:30 a.m.

ENTERED:

s/Edmond E. Chang
Honorable Edmond E. Chang
United States District Judge

DATE: January 24, 2019